TIMOTHY M. BURGESS
United States Attorney

SUSAN LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-3378
Fax: (907)271-2344
Susan.Lindquist@usdoj.gov

Attorney for Defendant


### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DANIEL H. WESTCOTT, JR. AND DAN FOLEY, D/B/A ICY PASSAGE FISH | Case No. 1:03-cv-9-JWS |
| Plaintiffs, | **NPS'S BRIEF ON THE ISSUE OF WHETHER THE STATE CONCURRED WITH THE NPS'S ADJUSTMENT OF MONEY IN ESTABLISHED CATEGORIES AFTER RECEIVING THE APPLICATIONS** |
| vs. | |
| DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, | |
| Defendant. | |

The Defendant, National Park Service ("NPS"), through counsel, files its brief

proving that the State of Alaska ("the State") concurred with the NPS' decision to

readjust funds within the categories of eligible applicants established by the September

2001 Compensation Plan ("Plan").  See Plan at AR 141

## FACTS

In 1999, Congress appropriated $23,000,000 to the Department of the Interior for a program developed by the Secretary of the Interior with the concurrence of the State of Alaska to "fairly compensate" people and others negatively affected by restricting commercial fishing in Glacier Bay National Park ("GBNP")." AR 179.  When the National Park Service ("NPS') started to develop the program, Tomie Lee, the Superintendent of GBNP, and some staff met with state employees to decide how to get started.  Tr. 1-5.  At the time, Frank Rue was the Commissioner of the Alaska Department of Fish and Game and Rob Bosworth was the Deputy Commissioner.  Tr. 1-10.

Mr. Bosworth led the discussion for the State and it was decided that both the NPS and the State would have program managers paid for by the federal government.  Id. Both managers were to represent the two agencies and to work on the issues which came up.  Tr. 1-6.  It was also decided that a new economic assessment ("EA") of the financial losses due to the closure of commercial fishing would be done because the prior assessment done by the State was not thorough.  Tr. 1-6.  The State recommended the McDowell Group and that was done.  Tr. 1.6.  The State also suggested that the NPS hire a mediator for public comment named Abby Arnold, and that was done.  Id.  The NPS paid for both services.  Id.

The NPS hired Claude Mallot as its manager, but he was quickly replaced by Dr. Ron Dick, who had a Ph.D. in economics.  Tr. 1-7-8, 89-90.  The State hired Dick

Westcott v Dept of the Interior
1:03-cv-9-JWS                         -2-

HofMann and the NPS did not participate in that selection.  Tr. 1-8.  Mr. HofMann was employed full time from August of 1999 until a change in the state's administration which occurred around November of 2002.  Tr. 1-85; 2-133.  Mr. HofMann also worked closely with Superintendent Lee and they were the only two who worked on the program from the beginning to the end.  Tr. 1-90.

Mr. HofMann's job duties were "to ensure that the public was informed of the development of this plan, help organize meetings in the afflicted communities, provide the Park Service with information available through the public databases at the Department as well as individuals when they were filing their claims and seeking information, in general to keep the public process open and moving so that this plan could be completed in the most expeditious manner and the funds distributed."  Tr. 1-85-86.

At the onset, Superintendent Lee and Mr. HofMann attended a series of public meetings at communities in the Southeast.  Tr. 1-9-10.  Neither Mr. Bosworth nor Commissioner Rue attended the public meetings.  Tr. 1-10.  During this time the NPS had constant meetings with Mr. HofMann.  Id.  At one point, Mr. HofMann was injured between the end of June and September, 2000, and Rob Boswell would attend the meetings in his stead.  Tr. 1-12-13, 88.  Commissioner Rue did not attend the meetings. Tr. 1-13.  When a preliminary plan emerged, the NPS communicated with Mr. HofMann. Tr. 1-13.

Between the preliminary plan and the Plan, the NPS and the State held more

Westcott v Dept of the Interior
1:03-cv-9-JWS                         -3-

community meetings and met frequently with Mr. HofMann to discuss changes in the

Plan. Id. One example of a change that occurred from the preliminary plan, was that

NPS dropped any consideration of the age of the fisherman affected by the closure as a

factor to determine loss. Tr. 1-14. The NPS and Mr. HofMann discussed this issue and

made the change. Id. Commisioner Rue was never involved in agreeing to that change.

Tr. 1-14-15. Superintendent Lee considered that when Mr. HofMann expressed his

views, he was expressing the views of the State. Tr. at 1-15.

The Plan listed various categories of participants in the fishing industry and Mr.

HofMann assisted with the creation of the categories. Tr. 1-87. They were created

"through discussions with [him] and Park Service folks as well as Rob Bosworth on

several occasions." Tr. 1-87.

Mr. HofMann and Superintendent Lee also agreed to put funds into the categories

in the Plan. Tr. 1-19-20 (Lee); Tr. 1-93 (HofMann). The NPS put certain amounts of

money in the categories to begin with to give the applicants an idea of what the NPS was

expecting would be the compensation, based on the EA. Tr. 1-26. Mr. HofMann

explained that he, together with others, decided to put money into particular categories in

attempt to put it before the public for discussion. Tr. 1-93. The NPS thought that putting

money into categories would give the applicants an idea about the maximum amount that

the NPS thought would be available in each category. Tr. 1-29.

The amount of money appropriated to each category was based on prorating the

loss estimated by the McDowell Group.  Tr. 1-29, 93.  Reading the Plan together with the EA, the NPS thought that it was clear that adjustments would have to be made.  Id.  When the Plan was issued, a summary of the EA was included.  AR 167.  The NPS wanted the applicants to know that the amount of money in the categories was the best estimate that they had at the time.  Tr. 1-30. .  As it turned out some of the estimates were "lousy" and some money was shifted from one category to the other.  Tr. 1-30-31.

The NPS expected that there would be some changes in the distributions after the applications came in.  Tr. 1-27.  Mr. HofMann understood that the Plan informed how the money could be distributed, and not how it would absolutely be distributed.  Tr. 1-93.

Mr. HofMann stated that

> it was repeatedly pointed out in the public meetings and in discussions with individuals I had that those numbers were not concrete, that that proportionality was going to be the determining factor in the end of how those funds would break out into categories.  In the public meetings discussing those, the McDowell report -- in the public meetings we conducted in the various communities, individuals might come forward and say there's this much McDowell Group says is going to be there, is that all going to be there and I would say no, that is how their information say it could break out but it's going to depend on how the actual claims all total out once they're all amassed.  So it was there as a talking point but it was not there as a hard figure.

Tr. 1-94.

Superintendent Lee understood from discussions and advice from the Solicitor's legal office that the Congressional mandate to "fairly compensate" meant that the NPS could not favor any group of fishermen.  Tr. 1-16.  To be consistent across the board they

decided that they would be "compensating proportionately on past earnings." Id. The

NPS looked at what applicants could prove was their past earnings from fishing in

Glacier Bay proper, and then they would receive a proportionate amount of money.  Tr. 1-

17, 19.  Superintendent Lee and Dick HofMann talked extensively about "the fact that

once we got all of the applications in, that we were going to have to do this

proportionately -- compensate people proportionately and that those things that were

identified in the economic assessment, those categories and, again, in the plan, that we

would have to make some adjustments based on the fact that those were gross estimates

from McDowell Group."  Tr. 1-21.  This information had been discussed and conveyed to

Mr. Bosworth and Commissioner Rue.  Tr. 1-98, 110.  Mr. Bosworth stated that:

> there was quite a bit of discussion around the original allocation table to the
> effect that it was using best available data but did not oft -- oftentimes, did
> not reflect what the fishermen considered to be reality.  In other words,
> some of the statistical districts and so on in which fishermen fished did not
> neatly meet with the -- with the area of interest of the Park Service and that
> would have been Glacier Bay proper. . . .So there would have been
> approximations or estimates used by the -- by the Park Service in its
> development of that early table."

Tr. 1-120-21.

At important junctures in the process the state staff would have meetings to discuss

developments.  Tr. 2-138.  After the Plan was completed, Mr. HofMann presented it to

Mr. Bosworth and Commissioner Rue.  Tr. 1-16.  Throughout the whole process

Commissioner Rue was primarily concerned about the amount of total money available to

compensate Alaskans.  Tr 2- 160-61.  Commissioner Rue's understanding of the way the fishermen and other applicants would be compensated was according to how much they fished in the bay.  Tr. 2-162.

Moreover, according to Mr. Bosworth, the State "specifically did not take positions on allocative -- im  -- implications of the settlement -- or of the plan."  Tr. 1-121.  The State did not take a position on whether one group over another would benefit.  Tr. 1-121.

This position is supported by the State's comments made in a letter Mr. Bosworth write to Mr. Weyhrauch.  AR 951.  Mr. Bosworth wrote that its role in the compensation program was limited.  Id.  He stated that the State would provide general comments about the general structure of the proposed program and that it expected to be asked to concur in that structure.  Id.  In February of 2000, the State's approach was to assist the NPS in developing a fair compensation program for those adversely affected, to help facilitate a public process; and to help it remain focused on the final compensation plan so that the full amount of the compensation fund is distributed fairly and as quickly as possible."  AR 952.  Commissioner Rue recalls that he would not have any say on whether the amount of money placed in the Dungeness crab crew category, for example, was the right number of the wrong number.  Tr. 2-168.  Commissioner Rue was not concerned about appropriate compensation for an individual; he was concerned about fairness and process.  Tr. 2-169.  Commissioner Rue signed a formal letter concurring in the Plan, but at that time he had

not read the Plan completely.  Tr. 2-144, 163.  In concurring in the Plan, he recalls Mr. HofMann and Mr. Bosworth going over the key points in the Plan.  Tr. 2-165.  He understood that applicants would be reimbursed based on the amount of money they had earned by fishing in GBNP in the past.  Tr. 2-150, 161-62.

When the applications were received, the NPS was aware that it would have to make some real changes.  Tr. 1-21.  From early on, the McDowell Group had told Superintendent Lee and Mr. HofMann that the estimates were gross and that they would not know how to split the pie until the applications were received.  Tr. 1-32.  All along, the NPS and the State had intended to compensate applicants proportionately to what they had earned from fishing in the bay in the past.  Tr. 1-26 (Lee); Tr. 1-92 (HofMann).

Mr. HofMann was still working with the program as applications were being evaluated.  Tr. 1-96.  About three months into the process, it became clear that "there would be some fairly significant variations between where McDowell had estimated and where the actual claims were coming out."  Tr. 1-96.  Superintendent Lee told Mr. HofMann that the there was a "big difference in the numbers from the estimates that we had gotten from the McDowell Group and the reality from -- from the applications and that we were going to have to work through that and come up with -- you know, with the final figures."  Tr. 1-31-32.  Superintendent Lee does not recall telling Mr. HofMann about what the final money amounts were; she did not "recall personally telling Mr. HofMann that we were going to have to change X number of dollars to Y . . . ."  Tr. 1-33.

But she does remember telling him "the fact that the -- that the estimates were -- were very, very off and [she] may have given him some ex -- examples of what those were." Tr. 1-32.  Superintendent Lee knew that Mr. HofMann was already well aware that the NPS would have to adjust some money so that everyone was paid proportionately.  Tr. 1-32.  Mr. HofMann stated that even before the applications were received, he had the discussed the need to pay applicants proportionately.  He stated that even before a single claim was filed

> . . . it had been our decision, our agreement from very early on in this process that Tomie Lee, myself and Rob Bosworth and the others initially involved in it that with the vague legislation that we dealt with to fairly distribute, what that meant -- we determined fairly meant that all claims would be prorated on the same basis.  We did not anticipate $93 [sic] million being sufficient to fully compensate everybody.  We did not feel that it would be fair to fully compensate one category, leave another category out on individual -- leave another individual out.  All categories, all individuals given the volume of funds available, all claims accumulated, approved, decided upon -- all claims would then be prorated on an equal basis.

Tr. 1-91.  That meant to him that the proportionate payments would be applied "across all categories and all claimants, everybody."  Tr. 1-92.  Mr. HofMann gave an example of what proportionate payment meant.  He stated:

> If, for example, an individual was able to document $10,000 in claim, another individual was able to document $1,000 in claim, if the purse of money available would only allow 75 cents on the dollar, the person who had $10,000 would get 7,500, the person that had 1,000 in documentation would only get 750.

Tr. 1-92.

Westcott v Dept of the Interior
1:03-cv-9-JWS                        -9-

Mr. HofMann did not think any decision had to be made about how to deal with the variations between the amounts predicted as losses in the categories and the actual losses attested to by the applications because it was already agreed and understood that "the driving concept" of "fairly treating people," was "that equal prorating, that necessitated the decision in the final plan that all claims would be amassed and brought to a total so that the prorating figure could be derived before any monies were distributed out." Tr. 1-97.

Mr. HofMann recalls a meeting with Joe Darnell, the NPS's attorney and Dr. Dick about whether NPS had the discretion to move funds after the applications had been received, and Mr. HofMann stated that "[w]ithin the context of equal prorating, yes, I do believe we had that conversation and I said that -- and within that concept of the equal prorating and the claims, that that was going to occur and, again, we'd said that in the public process leading up, that those McDowell numbers were not concrete." Tr. 1-97; See AR 219-20. According to Mr. HofMann, "We had agreed that that is what would occur, that proportionality and I was told that that is what was done by Ron Dick." Tr. 1-98. Mr. HofMann also heard that during the appeal process, the adjudicators shifted some more money to the support business category. Tr. 1-98. Change was expected.

After the NPRS readjusted the money in the categories so that all applicants would be paid on a proportional basis, the NPS notified the applicants of their awards and published the final payout decisions on the web. Tr. 1-34. Commissioner Rue never read

Westcott v Dept of the Interior
1:03-cv-9-JWS                        -10-

the web publication about the final distribution of the money, and Mr. Bosworth only reviewed parts of it. Tr. 1-126; 2-164. Commissioner Rue, Mr. Bosworth and Mr. HofMann did not raise any issues about the final distributions posted on the web site. Tr. 1-36-37. No state representative objected that the State did not concur with any decisions made. Tr. 1-37. Mr. HofMann had nothing negative to say about adjusting the money after the applications were received. Tr. 1-38.

The Plan, itself, stated that compensation would be proportionate. AR 147. The NPS announced that the plan was based on four factors. Tr. 1-79. Two factors were:

• Compensation to permit holders is proportional to past earnings from Glacier Bay.

• Compensation for processors is proportional to past gross earnings from Glacier Bay production.

Both Superintendent Lee and Mr. HofMann stated that adjusting the amount of money in the categories was not a change in the Plan. In fact, Mr. HofMann did not determine that there was any need for a written concurrence precisely because it was just an anticipated adjustment, rather than a significant change. Tr. 1-97.

Within the State, there are no formal regulations that state when a formal concurrence is required. Tr. 1-122; 2-175-76. Commissioner Rue relied on his staff, Mr. Bosworth or Mr. HofMann to come to him when a concurrence was needed. Tr. 2-176. Neither came to him and requested that a formal concurrence on the issue. Tr. 2-176. Commissioner Rue believed that either man would have come to him if they thought a

formal concurrence was needed.  Mr. Bosworth stated that at the time he did not consider

a shifting of the funds to be a substantial change in the Plan because he understood the

shifting to be "a revision based on better information." Tr. 1-123.  Commissioner Rue

testified that if there was a significant change it is possible he could have withdrawn his

concurrence.  Tr. 2-175.  But neither Mr. Bosworth nor Mr. HofMann concluded that

adjusting the money in the categories was a significant change in the Plan.  Tr. 1-110

(HofMann); Tr.1-123 (Bosworth).

**I.     THE STATE'S AGENTS AGREED THAT THE MONEY ALLOCATED TO CATEGORIES COULD BE ADJUSTED AFTER THE APPLICATIONS WERE RECEIVED TO MAKE COMPENSATION PROPORTIONAL.**

1.     Statutory Construction Mandates That the Word "Concurrence" Be Given Its Plain Meaning

The federal statue at issue states: "The Secretary of the Interior is authorized to

provide $23,000,000 for a program developed with the concurrence of the State of Alaska

to fairly compensate United States fish processors . . . " and others. AR 179.  This Court

asks whether the State concurred with the adjustment of money in the categories of

applicants which had been established in the Plan of September 2001.  To answer this

question, one needs to determine what the word "concurrence" meant in the statute.

When a statute as written is not ambiguous, the "the language of the statute itself 'must

ordinarily be regarded as conclusive.'" United States v. James, 478 U.S. 597, 606, (1986)

(citation omitted).  "Unless exceptional circumstances dictate otherwise, "[w]hen we find

Westcott v Dept of the Interior
1:03-cv-9-JWS                    -12-

the terms of a statute unambiguous, judicial inquiry is complete." <u>Rubin v. United States</u>, 449 U.S. 424, 430, (1981).

Black's Law Dictionary defines concurrence as "1. Agreement; assent." <u>Black's Law Dictionary</u>, (8th ed. 2004), concurrence. Thus, the plain meaning of the statute is that the NPS was charged with creating a compensation plan with the State's agreement. Moreover, when a party is informed about a fact and does not voice a disagreement and acts in accordance with the factual information, when a disagreement would be naturally expected, then an admission by silence occurs. Docket 56 at 3 & n. 7; <u>Black's Law Dictionary</u>, (8th Ed. 2004) admission, including "*adoptive admission*. An action by a party that indicates approval of a statement made by another, and thereby acceptance that the statement is true." By extrapolation, if the State is informed of an action, does not disagree with it and acts in conformity with the information, then agreement occurs.

2.    The State Concurred With the NPS's Adjustment of Money in the Categories In Order to Pay Everyone Proportionally.

The Plaintiffs argued that the adjustment of funds was done in secret and without the State's concurrence. To the contrary, the NPS did nothing in secret. The NPS paid for Mr. HofMann, a full-time state employee to keep the State informed every step of the way, including after the formal concurrence issued. Mr. HofMann was Commissioner Rue's point man, and to a lesser extent, Mr. Bosworth was. Tr. 2-158. Mr. HofMann was informed about and participated in creating the categories and allocating money into the

Westcott v Dept of the Interior
1:03-cv-9-JWS                    -13-

categories.  He knew about this before the Plan issued and discussed it at public meetings.

Both he and Mr. Bosworth knew that the allocations were based on estimates provided by

the McDowell Group.  Most importantly, all three state employees knew that

compensation was to be based on the amount of money applicants had earned from

fishing in in GBNP in the past and that all applicants would eventually be paid

proportionally to that amount.

The Plaintiffs will argue that the Plan as it existed when Commissioner Rue

formally concurred could not be changed one iota without another formal concurrence.

There are no state or federal laws or regulations which dictate when and how concurrence

needs to be made.  Concurrence just means agreement.  There was ample evidence that

Mr. HofMann knew before the Plan issued that adjustments would have to be made and

that both agencies had decided that fairness required treating all applicants the same and

paying them on a proportionate basis, based on how much money they had earned from

working in GBNP in the past.

Moreover, the State did not view its role as requiring involvement in deciding how

money was actually allocated.  The structure of the Plan remained exactly the same as it

had been before the money had been readjusted.[1]  Mr. Bosworth viewed the State's role

as approving the structure of the plan, and not the precise compensation of an individual

---

[1]  Structure is defined as "[t]he organization of elements or parts."  Black's Law
Dictionary, (8th Ed. 2004), structure.

group or person.  Even Commissioner Rue was not going to involve himself in deciding what was the right number, meaning money, to be provided to a particular category of applicants.

Mr. HofMann and Superintendent Lee, who were the only two people who participated in the plan from start to finish, had discussed from early on that the EA was only gross estimates and that adjustments would probably be made once the applications came in.  According to both of them, the adjustments of funds within the categories were not changes in the Plan.  Adjustments were inevitable, whether they came from the decisions of Superintendent Lee and Dr. Dick working in conjunction with Mr. HofMann or whether they came from the decisions of the internal appeal adjudicators. Some adjudicators allocated additional money to small business category during the appeal process.  Tr. 1-98; AR 164, 233 (showing greater ratio percentage for  businesses). The structure of the Plan, however, stayed the same with the same category of small business still receiving funds.  The individuals who were authorized to seek written concurrence from Commissioner Rue, and who had initiated such formal concurrence in the past, did not, in their discretion, believe that the adjustment of funds was a significant change which might need formal concurrence.  Mr. Bosworth, who actually drafted the prior formal concurrence, did not consider the adjustment of funds within established categories to take into account more reliable information, as something that required formal concurrence.  Presumably he would have been the employee to bring this issue up

Westcott v Dept of the Interior
1:03-cv-9-JWS                              -15-

with Commissioner Rue and he did not find it necessary.

The Plaintiffs will also argue that only Commissioner Rue could concur and that is demonstrated by the fact that only he signed the only written concurrence in the record. This argument, however, relies on a exaggerated interpretation of the word concurrence. Concurrence means agreement, no more and no less. Congress did not mandate a written concurrence. In regards to the Congressional request that the program be developed "with the concurrence" of the State, Mr. Bosworth concluded that "the purpose of the intent language that was included in Congressional legislation was for the state to be comfortable with the program that National Park Service was preparing." Tr. 1-118-19. Although Commissioner Rue expressed that only he, and not Mr. HofMann, had the authority to concur for the state, his interpretation of what concurrence requires is not controlling. See Tr. 2-138. It is Congress' use of the word concurrence means and that is controlling. When a word is not ambiguous, it should be given its common meaning, which is agreement or assent. Moreover, at least on one occasion Mr. Bosworth wrote a formal letter of concurrence for the program to take the next step and he signed it for himself, and not on behalf of Commissioner Rue, and on another occasion he and Mr. HofMann both signed a letter providing "concurrence." AR 246-477.

Moreover, Mr. HofMann was hired by the State and was the State's full time program manager. The NPS did not err in concluding that Mr. HofMann had the actual authority, and at a minimum the apparent authority, to provide the concurrence or

Westcott v Dept of the Interior
1:03-cv-9-JWS                            -16-

agreement of the State about issues that arose and were discussed during the process.  If

the Plan was etched in stone at the moment of Commissioner Rue's written concurrence,

then there would have been no reason for Mr. HofMann to continue to participate in the

program for an additional year after the September 5, 2001 Plan issued.  Even

Commissioner Rue's formal letter of concurrence states that it is for using the Plan as a

guiding document.  AR 248.

The Plaintiffs will argue that the State demonstrated a pattern and practice of

issuing written concurrences and that the NPS should have known that Mr. HofMann

should not have allowed any changes without a concurrence.  There was also a pattern

and practice of Mr. HofMann agreeing to non-significant changes without getting written

concurrence.  One example was the decision to drop the age of the applicant as a relevant

factor to determine loss.  Tr. 1-108-9.  There were also interim payments provided for

which the State did not provide a written concurrence.  Tr 1-109.  The formal written

concurrence occurred after a large phase of the project was done.  Before it issued, Mr.

Bosworth and Mr. HofMann were well aware that the Plan was based on estimates and

that there were would be some adjustments made when the information from the

applications was received.  The State concurred in the adjustment of funds by act and

word and by not objecting to the adjustment of money in the categories when its agents

were informed about it before it occurred.

## II.    THIS COURT CANNOT REDRESS ANY INJURY THE PLAINTIFFS'

**MAY HAVE SUFFERED BECAUSE THE STATE IS NOT A PARTY AND THERE IS NO EVIDENCE TO PROVE THAT IF ANY PROCEDURAL DEFECT WERE CORRECTED, THE RESULT WOULD BENEFIT THE PLAINTIFFS**

Plaintiffs appear to assume that if formal concurrence was required to adjust the amount of money in the categories, then the State's failure to give formal concurrence means the NPS acted illegally and the end result is it must go back to the Plan to which the State formally concurred.  That is an incorrect assumption.

In <u>Greater Tampa Chamber of Commerce v. Goldschmidt</u>, 627 F.2d 258, 260 (D.C. Cir. 1980) ("Greater Tampa"), the Plaintiffs claimed that the Department of Transportation ("DOT") illegally entered an executive agreement with the United Kingdom over the use of each countries' airspace.  They identified "as the legal failing of the agreement several 'procedural' flaws in its execution," among which was DOT's failure to have the agreement ratified by the Senate because the agreement was technically a treaty.  <u>Id.</u> at 260.  Nor did the DOT confer with the Civil Aeronautics Board or the Members of Congress as required by law.  <u>Id.</u> at 261.  The Court evaluated the Plaintiffs' claims by referring to the Supreme Court's standing doctrine "which holds that, absent a substantial likelihood that a federal court can redress the injury a plaintiff claims to have suffered, the plaintiff has no standing to invoke the court's power."  <u>Id.</u> The D.C. Court found that the appellant's were asking that the agreement be enjoined until the Senate could consider it.  <u>Id.</u> at 263.  The Court reasoned that if the Senate

Westcott v Dept of the Interior
1:03-cv-9-JWS                    -18-

ratified the agreement, the appellants would not get what they sought.  For the Plaintiffs to get what they desires, the Senate would have to reject the Agreement.  Id. at 208. There was no evidence that "were the agreement renegotiated, the United Kingdom would be amenable to terms other than those of [the first agreement].  Id.  The Court concluded that the appellants had not demonstrated that the Court could redress the injury the appellants state they have suffered.  Id. at 265.

In the case at hand, the Plaintiffs allege a procedural defect, in that they claim that the State did not concur in the adjustment of the funds in the categories.  However, this court cannot redress the injury they claim.  Although they did not ask this court to enjoin the Plan, they want this court to do something about the alleged procedural defect. Allegedly they want the Court to require the NPS to redistribute awards according to the Plan as it existed when Commissioner Rue signed a letter in which he concurred with the Plan.  However, Congress appeared to require the NPS to develop a program "with the concurrence" of the State for the benefit of the State, and not for the benefit of any individual applicants.  Should a procedural defect be found, the State should have two options, to concur in the adjustment or not.  If it chose not to concur, there is no substantial likelihood that the Plaintiffs would get what they requested, which is to go back to the Plan as it existed when Commissioner Rue wrote his concurrence.  The Plan as ratified became subsequently unacceptable to the NPS given the additional information it received from the applicants.  AR 219.  The NPS found that there would be

Westcott v Dept of the Interior
1:03-cv-9-JWS                              -19-

disproportionate compensation if the money was left as was allocated in the Plan. AR. 220. Superintendent Lee felt that it was not fair to compensate crewmembers at a higher level than fisherman because fewer crew members made applications for the available money in the categories. See Tr. 1-25, 31. There is no evidence that the NPS would have accepted a Plan that had been rendered unfair by a well-meaning error of prematurely putting money into categories.

In sum, this Court cannot redress the Plaintiffs' injuries because there is no evidence about what the State would have done if formal, written concurrence had been required every time changes were made during the application process and the appeal process. There is no evidence that the State or NPS would have accepted the terms of September 2001 Plan, because those terms were in conflict with the previously established principle that applicants were to be paid proportionately, just as there was no evidence in Greater Tampa that Great Britain would have accepted other terms regarding its airspace. In sum, this court can not redress the Plaintiffs' injuries if they were caused by the failure of the State to issue a formal written concurrence after changes.

Moreover, to this date, the Plaintiffs have not sued the State for not withdrawing its concurrence when it knew the money was adjusted in the categories. After the awards were published on the web and the explanation about how and why the money amounts were adjusted in the categories, and before money was paid out, no one complained. The State has not objected that the NPS failed to get is formal concurrence to the Plan as it

Westcott v Dept of the Interior
1:03-cv-9-JWS                          -20-

was finally implemented. Commissioner Rue did not even bother to read the Plan completely either before or after the amounts were adjusted. After the Plan was implemented, Mr. Bosworth read only the part about the Dungeness crab fishery, the fishery which involves Mr. Westcott's claim, and he did not find anything objectionable. Mr. HofMann agrees completely with Superintendent Lee that the adjustment of funds was not a change in the Plan and that proportionate payment was what was anticipated all along. Lastly, Commissioner Rue is not aware that anyone appealed from anyone challenging the State's concurrence in the Plan. Tr. 2-154.

      1.     Only the State Should Be Able to Claim that the NPS Failed to Obtain It's Formal, Written Concurrence.

One tangential issue is whether the Plaintiffs have standing to challenge the Plan on the basis of the State's failure to give a written, formal concurrence. "To satisfy constitutional standing, plaintiffs bear the burden of showing that they meet three requirements: (1) they suffered an 'injury in fact;' (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is 'likely,' as opposed to 'speculative,' that the injury will be redressed by a favorable decision. Tyler v. Cuomo, 236 F.3d 1124, 1131 (9th Cir. 2000) (citations omitted). Certainly the section of the statute requiring concurrence was written for the benefit of the State. If the NPS did something that deprived the State of its right to assert agreement, then it would be the State which would be injured and would have standing under the statute to enjoin the Plan as implemented. There is no

Westcott v Dept of the Interior
1:03-cv-9-JWS          -21-

private right of action specifically written into the statute and the statute is not a contract which might create benefits for third parties.  The State has never objected to the Plan as it was published on the web.

Moreover, the Court is reviewing the NPS's decision, not the State's decisions.  If the Court concludes that the State should have formally concurred after the adjustment and failed, then that is a State failure, not an NPS failure.  The NPS did everything possible to keep the State informed.  It paid for Mr. HofMann to be a full time state employee liaison.  If indeed Mr. HofMann should have sought formal, written concurrence when the funds were adjusted in the categories, then that was the State's procedural error, and not the NPS' error.  As the State is not a party to this action, the Plaintiffs' injury cannot be traced to the federal Defendant's error.

Lastly, Plaintiffs' injury will not be addressed if the Court finds that the state was required to concur in a formal, written letter every time a change was made.  The Plaintiffs want a return to the Plan, as it existed before applications were received.  It is speculative, and highly unlikely, that the State would concur in a proposition that would render the compensation grossly unfair and violate the statutory mandate to fairly compensate recipients.

## CONCLUSION

Concurrence means agreement.  When the NPS informed Mr. HofMann that it was adjusting the amount of money allocated in the categories of the final Plan, Mr.

Westcott v Dept of the Interior
1:03-cv-9-JWS                              -22-

HofMann, the state's agent, agreed with that action.  His testimony is consistent with Superintendent Lee's testimony.  Both of them stated that from the very beginning, they recognized that the EA was only an estimate and that the funds would have to be adjusted. Tr. 1-24, 32 (Lee); Tr 1-106 (HofMann).  Neither of them viewed the adjustment as a "change" in the Plan, as the adjustment had been contemplated all along Tr. 1- 76 (Lee); Tr. 1-97, 109-10 (HofMann).  Both of them agreed that the concept of proportionate payment was something that was going to occur and that had been explained to the public. Tr. 1-16, 21 (Lee); Tr. 1-94, 97, 99 (HofMann).  In fact, the Plan stated in the summary that "[c]ompensation to permit holders is proportional to past earnings from Glacier Bay.  Compensation for processors is proportional to past gross earnings from Glacier Bay production."

Because both the NPS and the State knew that the EA was only an estimate and that payment was going to be proportionate to past earnings, both entities agreed that adjusting the money in the categories was an action in accordance with their agreement all along.  It was not a change in the Plan and the structure of the Plan was not altered at all.  Moreover, Mr. HofMann discussed the principle of proportionate payments with Commissioner Rue and Mr. Bosworth before the State formally concurred.  Neither Mr. HofMann nor Mr. Bosworth deemed the adjustment a significant change, such that a new formal concurrence from Commisioner Rue was needed.

The State informally concurred in the adjustment.  No one, not even the Plaintiffs,

formally challenged the State's actions. The State had Mr. HofMann working on the program after the final concurrence, he was told the money in the categories was going to be adjusted, and he never objected to the adjustment. In fact, he totally agreed that the principle of proportional payment was anticipated and accepted before the State concurred on the Plan and that the money was adjusted to conform with that principle.

Moreover, even if the Plaintiffs challenged the State about its failure to concur, the end result would not necessarily be to reinstate the Plan as it existed when Commissioner Rue formally concurred. Rather, the State could subsequently formally concur with the adjustments, and if it did not, the NPS could refuse to accept the Plan without the adjustments. The Court cannot redress the Plaintiffs' injury because there is no substantial likelihood that the Plaintiffs would get what they want even if the alleged procedural error were corrected.

The Plaintiffs want to read more into the word concurrence than is required. There is simply no requirement anywhere that a formal letter from the Commissioner is required before "concurrence" occurs. The State concurred in the adjustment in the Plan by Mr. HofMann's words, actions and failure to object to the adjustments after he was informed about hem. The reality is, Mr. HofMann completely concurred with the adjustments. The NPS asks this Court to find that the State concurred in the adjustments made to the amounts of money placed into categories after the applications were received and, therefore, the NPS acted legally and rationally.

Westcott v Dept of the Interior
1:03-cv-9-JWS                    -24-

RESPECTFULLY SUBMITTED on January 11, 2006.

TIMOTHY M. BURGESS
United States Attorney


s/ Susan J. Lindquist
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail: susan.lindquist@usdoj.gov
AK #9008053


**CERTIFICATE OF SERVICE**

I hereby certify that on Jan. 11, 2006,
a copy of the foregoing **NPS'S BRIEF ON THE ISSUE OF WHETHER THE
STATE CONCURRED WITH THE NPS'S ADJUSTMENT OF MONEY IN
ESTABLISHED CATEGORIES AFTER RECEIVING THE APPLICATIONS**
 was served on

Bruce B. Weyhrauch, LLC
114 S. Franklin Street, Suite 200
Juneau, AK 99801


by the Court electronically and by email

s/ Susan J. Lindquist


Westcott v Dept of the Interior
1:03-cv-9-JWS                    -25-