Law Office of Bruce B. Weyhrauch, LLC
Of Attorneys for Plaintiffs
whyrock@gci.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DANIEL H. WESTCOTT, JR. and DAN FOLEY, D/B/A ICY PASSAGE FISH | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. J-03-009 CI (JWS) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, | ) ) ) |
| Defendant. | ) ) ) |

## PLAINTIFFS' SUPPLEMENTAL BRIEF

**I.**     **Summary of Supplemental Briefing**

In 1998, Congress passed a law that required the State of Alaska to concur with a Park Service compensation program to pay those negatively affected by commercial fishing closures and restrictions in Glacier Bay.  On September 5, 2001, the State concurred in writing with the Final Plan prepared by the National Park Service, which allocated $23 million into categories of parties affected by the fishing closures and restrictions. Only the Alaska Department of Fish & Game (ADF&G) Commissioner could give the State's final concurrence to the Park Service Compensation Plan.

The Park Service made that Final Plan public.  The plaintiffs and others affected by the Glacier Bay fishing closures submitted applications expecting to be compensated

according to the split of compensation contained in the Final Plan concurred in by the State of Alaska. After the applications were submitted, the Park Service changed the Final Plan by changing the amounts of money that had been allocated to each category of claimant. The Park Service did not make its changes public. The State of Alaska did not concur with the after-the-fact changes that the Park Service made to the Final Plan.

Because the State did not concur with the changes made to the Final Plan, the plaintiffs should be compensated according to the Final Compensation Plan that was finalized and concurred in by the State in September 2001. Any changes made after the Final Compensation Plan was published in September 2001 should be ruled as void, and having no effect.

## II.    The Procedural Setting

On August 9, 2005 (Docket 49), the court issued an order to show cause why it should not grant the plaintiffs' summary judgment motion on the grounds that the Park Service failed to obtain the State of Alaska's concurrence when it developed the new allocation scheme in the Glacier Bay Compensation Plan. On August 25 (Docket 51), the court ordered an evidentiary hearing to consider testimony regarding communications and consultation between the defendant and the State about the alteration in the allocation of funds among categories of participants in the Glacier Bay Commercial Fishing Compensation Program. At the conclusion of the evidentiary hearing, the court ordered the parties to file supplemental briefing on the issue of whether the Park Service failed to

obtain the State of Alaska's concurrence when it changed the Final Glacier Bay

Compensation Plan.[1]

## III.    The Relevant Statute and Timeline of Events

   A.        Federal Statute at Issue Requires the State of Alaska to Concur With a
             Commercial Fishing Compensation Program.

To appreciate the significance of the Park Service's failure to obtain the State's

concurrence before reworking and changing the Final Compensation Plan, it is helpful to

review the history of the Park Services' dealings with the State following the passage of

the enabling statute.  Section (c) of the law Congress passed provided $23 million "for a

program developed with the concurrence of the State of Alaska" to compensate

processors, fishing vessel crew members, and others negatively affected by restrictions

on fishing in Glacier Bay.[2]

---

[1]     The plaintiffs have standing to sue the Park Service.  The plaintiffs suffered an injury in fact, which is concrete and particularized, actual not conjectural, and there is a causal connection between the injury and the conduct complained of.  In addition, that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Alaska Center for the Env't v. West, 31 F. Supp. 2d 714 (D. Alaska 1998).  The plaintiffs reduced compensation was caused by closing Glacier Bay to fishing, and a change in the Final Compensation Plan by the Park Service.  The plaintiffs were to have received compensation under the Final Plan, which would be reduced if the Park Service's revised plan is upheld.  Their injury is actual and imminent.  If the Park Service had not reworked the Final Plan, the plaintiffs would not be arguing this issue.

[2]     Administrative Record page 179 (referred to as AR).  This statute is included in the final Glacier Bay Commercial Fishing Compensation Program (Sept. 2001), at page ii.  Pub. L. 105-277, 112 Stat. 2681, section 123.  The law also ended Dungeness crab commercial fisheries, and provided that participation in the Tanner crab pot, salmon troll, and halibut longline fisheries would be limited to certain areas in Glacier Bay, and only allowed for those fishermen who qualified for lifetime access permits.

B.      Timeline of Events in Development of the Park Service's Commercial
        Fishing Compensation Program.

What follows is a timeline after Congress approved the $23 million commercial

fishing compensation program for Glacier Bay commercial fishermen.

| DATE | EVENT |
|------|-------|
| October 1998 | Congress passes Law establishing Compensation, requiring State of Alaska's concurrence in a plan, and restricting and closing commercial fisheries in Glacier Bay. |
| November 19, 1999 | Park Service Superintendent Tomie Lee writes to memorialize State's concurrence for calculating Glacier Bay processor interim compensation.[3] |
| November 24, 1999 | The State of Alaska through ADF&G provides written concurrence in Park Service decision to make interim payments to Dungeness crab processors.[4] |
| 1999 - 2000 | Park Service hires program manager Ron Dick to deal with Glacier Bay Compensation.[5]  Ron Dick and Park Superintendent Lee are primary contacts for Park Service.[6]

State of Alaska hires Richard HofMann as Glacier Bay Program Manager for ADF&G, who reports to Deputy Commissioner Rob Bosworth and ADF&G Commissioner Rue.[7] |

---

[3]      Exhibit B.  (Exhibits A through O were admitted into the record during the Evidentiary Hearing on Nov. 15, 2005 and filed on Dec. 13, 2005.)

[4]      Exhibit C.

[5]      See testimony of Glacier Bay National Park Superintendent Lee ("Lee testimony") at page 65.  The testimony page numbers refer to pages of the two evidentiary hearings conducted in Anchorage on December 2, 2005, and in Juneau on November 15, 2005.

[6]      Lee testimony 9.

[7]      Hearing testimony of former ADF&G Commissioner Frank Rue page 137-38.

|  | McDowell Group retained to prepare Economic Assessment on distribution of compensation.[8] |
|--|--|
|  | Resolve, a mediation firm, retained to facilitate public input on process.[9] |
|  | Community meetings with the public through out Southeast Alaska on Glacier Bay compensation.[10] |
| February 18, 2000 | ADF&G Deputy Commissioner Bosworth advises that because there are no guidelines for interim payments and inadequate information, the McDowell Group is providing information on financial impacts and would assist in developing a compensation program, facilitate a public process, and focus on a final compensation plan to distribute compensation funds fairly and quickly.[11] |
| March 22, 2000 | Dungeness crab crewmen of "bought-out" Dungeness crabbers included with Dungeness processors as eligible for interim compensation because immediately harmed by closing Dungeness crab fishery in Glacier Bay.[12] |
| August 1, 2000 | McDowell Group provides Glacier Bay Compensation Plan Economic Assessment Final Report to Park Service.[13] EA serves as the "guiding document" for distribution of money in the Final Compensation Plan.[14] |
| August, 2000 | Park Service provides draft compensation plan to public and seeks state concurrence. |

---

[8]    Lee testimony 8.
[9]    Lee testimony 8.
[10]   Lee testimony 10.
[11]   AR 951-52
[12]   AR 178.
[13]   AR 8.
[14]   AR 146.

| | |
|---|---|
| September 27, 2000 | ADF&G provides written concurrence with Park Service decision to take compensation plan to the public for review and comment.[15] |
| May 11, 2001 | Park Service provides revised May 2001 version of compensation plan to ADF&G incorporating comments of Park Service and Dep't of Interior solicitors and requesting State of Alaska concurrence.[16] |
| May 14, 2001 | ADF&G provides written concurrence of Park Service decision to forward May 2001 version of compensation plan to OMB for approval. ADF&G writes: "this concurrence is for continuing the process to develop and approve the plan, and we will need to see what changes, if any are made at OMB before considering final concurrence."[17] |
| August, 2001 | OMB approves Glacier Bay compensation plan as submitted by the Park Service, "using the process described in" Part V of the Plan.[18] |
| August 24, 2001 | Memorandum to ADF&G from Park Service's Ron Dick enclosing and forwarding final compensation plan to ADF&G.[19] |
| September 5, 2001 | ADF&G Commissioner Frank Rue provides written State of Alaska concurrence with Final Compensation Plan "to be used as the guiding document for distributing funds."[20]  Final Plan specifically provides that the "amount of compensation paid to an eligible applicant will be determined by the allocations detailed in this |

---

[15]     Exhibit D (AR 247).
[16]     AR 218.
[17]     Exhibit E (AR 246).
[18]     Exhibit G, 146 Fed. Reg. 49,696 (Sept. 28, 2001)
[19]     Exhibit H.
[20]     Exhibit I (AR 248).

compensation plan as informed by the Economic Assessment."[21]

Only ADF&G Commissioner Rue may give the State of Alaska's final concurrence to the Park Service compensation plan.[22]

| | |
|---|---|
| September 28, 2001 | Federal Register Notice published regarding approval of the final compensation plan.[23] |
| January 28, 2002 | Compensation application period closes.[24] |
| March 5, 2002 | Park Service officials and Mr. HofMann meet to discuss "some discretion" in moving "some funds" to correct "some" compensation in "some categories" and future discussion of "some options" to be discussed later between Park Service Program Manager Ron Dick and Superintendent Lee.[25] |
| | **No written State of Alaska concurrence on this approach.  No request to State of Alaska from Park Service for concurrence.** |
| | ADF&G Glacier Bay Program Manger Richard HofMann fails to discuss or explain the Park Service's changing money and pots of money in the Final Plan.[26] |
| March 27, 2002 | Park Service details, via internal memorandum, significant changes to Final Plan which calculates "a different set of compensation amounts" and changing all categories of |

---

[21]    AR 164
[22]    Rue testimony 134.
[23]    Date referred to in Exhibit K, Mar. 25, 2002 letter from Ron Dick to Dennis & Heather O'Neil.
[24]    AR 159.
[25]    AR 219-20.
[26]    Rue testimony 168.

compensation.  ADF&G not included or advised of distribution changes.[27]

**No written State of Alaska concurrence on changes.  No request from Park Service for concurrence with changes from ADF&G.**

March 25, 2002

Park Service writes that public comment period on the Compensation Plan ended in fall 2000, that the final draft of Plan was reviewed and evaluated by ADF&G, its attorneys, the Park Service and its attorneys and OMB.  "Agreement among all of the parties was reached" and final Plan published.  Park Service also writes: "**This office lacks the authority to change the content of the Final Compensation Plan at this late date**."[28]  Statement made despite changes under consideration by Park Service.[29]

April 5, 2002

Superintendent Lee sends out letters to applicants advising them of their compensation awards.  Applicants learn for the first time that Park Service changed the category amounts set forth in the Final Plan, but not how or why they were changed.[30]

**No written State of Alaska concurrence on changed category amounts.  No request from Park Service for State concurrence.**

April 18, 2002

Park Service distributes internal "Adjustment to Compensation Amounts" which revises distribution of compensation among categories of claimants.[31]  Superintendent Lee calls

---

[27]    AR 223-27.
[28]    Exhibit K (emphasis added).
[29]    See changes under consideration on March 27, 2003.
[30]    E.g., AR 289, letter from Superintendent Lee to Dan Westcott. AR 670 (letter from Superintendent Lee to Dan Foley).
[31]    Exhibit L (see AR 237-38 & 249-51).

"adjustment" a "redo" of the September 2001 Final Compensation Plan.[32]

**No written State of Alaska concurrence on this approach.  No request from Park Service for State concurrence.**

| | |
|---|---|
| May 6, 2002 | Letter from Park Service Regional Director Ronald Arnberger (authored by Ron Dick) to Senator Ted Stevens, stating that draft compensation plan reviewed by ADF&G, Park Service and their solicitors, and OMB and became final in September 2001.[33] |
| September 12, 2002 | Regional Director Arnberger letter to Senator Stevens (authored by Ron Dick) reiterating the extensive public process resulting in Final Plan concurred in by ADF&G.[34] |
| September 17, 2002 | Notice of hearing letters sent to applicants for compensation.  Claimants advised that the issues were limited to "eligibility for compensation" and that only the superintendent's decision regarding eligibility for compensation or the amount of compensation awarded could be appealed.  "No evidence regarding challenges to the Compensation Plan itself such as allegations that the plan is unfair" was allowed.[35] |
| January 22, 2003 | Hearing Officer appeal decisions released, co-signed by Regional Director Ron Arnberger. |
| March 19, 2003 | Final compensation payouts by Park Service.[36] |
| March – May, 2003 | Park Service discloses for first time on the web a new, changed methodology used to distribute |

---

[32]     Lee testimony 70-80.
[33]     Exhibit M.
[34]     Exhibit N.
[35]     AR 949-50, Notice of Hearing for Icy Passage Fish.
[36]     AR 228.

|  | compensation, which differs from the Final Plan concurred in by ADF&G.[37] |
|---|---|
|  | **No written State of Alaska concurrence on this methodology.  No request from Park Service for concurrence.** |
| November 15, 2005 | Richard HofMann cannot identify revised Park Service compensation redistribution and testifies that ADF&G did not concur in writing in the Park Service's redistribution.[38] |
| December 2, 2005 | Commissioner Rue testifies that the Park Service's revised redistribution was never explained to him.[39]  Rue agrees changes to Final Plan by Park Service were secret and drastic,[40] and that if it had been explained to him, he would not have concurred in changes on behalf of the State without public process.[41] |

## IV.    The Final Compensation Plan

   A.    Comparisons Between the Final Plan and the Revised Redistribution

   1.    Economic Assessment Guides the Final Plan

As indicated in the preceding timeline, in September 2001, after receiving written State of Alaska concurrence, the Park Service published the Final Compensation Plan, which distributed $23 million appropriated by Congress.[42]  Before finalizing the Plan, the McDowell Group prepared an Economic Assessment ("EA"),[43] which served "as the

---

[37]    Park Service Glacier Bay Compensation web pages AR 228-24; Park Service redistribution AR 237-38 (revised Glacier Bay Compensation; see Exhibit L (AR 237 and 249)).
[38]    HofMann testimony 109, 112-13.
[39]    Rue testimony 147
[40]    Rue testimony 157 & 158 (concealed from him as the official representative of the State, and the public).
[41]    Affidavit of Frank Rue, filed on November 14, 2005 ("Rue Affidavit") paragraph 21.
[42]    AR 143.
[43]    AR 9.

guiding document for the distribution of funds in [the] compensation plan."[44]  The Final

Plan refers to the EA's division of economic loss among fishing industry participants, and

sets forth the method for distributing compensation "among and within categories of

claimants."[45]  The Final Plan reiterates several times that compensation in the Final Plan

"<u>will be</u>" guided by the EA.[46]  The Final Plan provides further that each fisheries' loss "is

expressed as a percentage of the total loss," as determined by the EA.[47]  The Final Plan

refers to the distribution of compensation by category of affected party.[48]

    2.    <u>The Park Service Initially Followed Congressional Directive to Develop the
Compensation Program with the State's Concurrence</u>

At each point in the development of the compensation program before the State

concurred in the Final Plan in September 2001, the Park Service sought State concurrence

in writing.  Both the requests from the Park Service and the State's concurrences of

critical developments in the program were <u>in writing</u>.

    3.    <u>The Park Service Did Not Seek or Obtain the State's Concurrence with
Substantive Changes the Park Service Made to September 2001 Final Plan</u>

The Final Plan was provided to the public.  After the public relied on what was in

the Final Plan, the Park Service stopped meaningful communication with the State about

changes it was contemplating to the Plan.  The Park Service, however, did not stop

tinkering with the Final Plan.  The State and the public did not know it, but the Park

---

[44]    AR 146.
[45]    AR 149.
[46]    AR 149 (emphasis added).
[47]    AR 149.
[48]    AR 149, table 1.

Service was busy changing the Final Plan's methodology for compensation that had been very openly developed over a period of years. It scrubbed the Final Plan the State had concurred with and devised a new plan which provided for compensation payments based on a formula involving proportional payments. The State of Alaska was not asked for its concurrence, and it did not concur with these changes to the Final Plan.

The process by the Park Service in changing the Final Plan seems almost as if it was intentionally misleading to the public. On March 5, 2002, Park Service officials including Program Manager Ron Dick were already meeting to discuss moving "some funds" around in "some categories" and "some options" for future discussions between him and Superintendent Lee.[49]

At the same time, on March 25, 2002, Mr. Dick wrote the public (a compensation claimant) advising them that the public comment period on the Compensation Plan had ended in fall 2000, that the final draft of Plan was reviewed and evaluated by ADF&G, its attorneys, the Park Service and its attorneys, and OMB. The Park Service asserted that "agreement among all of the parties was reached" and final Plan published. Finally the Park Service was adamant: "This office lacks the authority to change the content of the Final Compensation Plan at this late date."[50] Yet changing the contents of the Final Plan at that late date is exactly what was going on.

The State of Alaska did not concur with the new revised plan prepared by the Park Service. The State of Alaska official responsible for concurrence, ADF&G

---

[49]    AR 219-20.
[50]    Exhibit K (emphasis added).

Commissioner Frank Rue, did not recall seeing the changes.[51]  The State was not aware of changes to the Final Plan by the Park Service, which Commissioner Rue agreed were secret and drastic.[52]

        4.        <u>Mechanics of the Plan and Elements of Compensation</u>

The Final Plan recognized that the Park Service cannot "prioritize losses" among the categories of affected parties, and "first compensate permit holders and processors, then distribute whatever is left among crew, employees, support businesses, and communities."[53]  Therefore, the Final Plan established categories to be treated the same. This is in the context of funding all the categories.  The Final Plan could, at that point, specify that every category will receive an equal share of $23 million, thus treating all the categories the same.  However, to clarify the issue, the Final Plan went on to specifically explain how each category was to be funded.

The Final Plan adopted analysis from the EA to establish compensation "within each category" and to mandate the "total compensation that <u>will go</u> to each group."[54] This language is not equivocal, it is mandatory, and is not qualified by an assertion that the compensation distributed within category "may" or "will" be changed later.

---

[51]      Rue testimony 155.

[52]      Rue testimony 157 (drastic change). The Park Service admitted it did not take revisions to the Final Plan public, or go through a public process.  Commissioner Rue was asked whether he would agree that if the revised plan the Park Service used to distribute compensation was concealed from the general knowledge or view and not visibly expressed.  Rue testimony 158. Since it was so concealed, the process used to make changes in the Final Plan was secret.  The definition of "secret" is "concealed from general knowledge or view … not visibly expressed …."  <u>American Heritage Dictionary</u> 1172 (1969).

[53]      AR 150.

[54]      AR 150 (emphasis added).

After establishing the percentage of distribution of compensation within each category of affected parties, the Final Plan, then applied those percentages to the total amount of compensation available, $23 million. For example, Table 2 of the Final Plan established that 3.3% of the available compensation would be for the Dungeness crab crew category.[55] Table 3 of the Final Plan then applied that to the $23 million to arrive at a figure of $759 thousand for distribution of compensation to that affected category. Again, the Final Plan did not state that this distribution would be changed later, and there is no referral to proportional changes to the distribution made after all applications for compensation were submitted.

The Final Plan established that in fact compensation was very unequal. The Final Plan recognized, based upon the EA and public participation, that even though the value of Glacier Bay harvests of Tanner crab and halibut were "nearly equal," Tanner crab fishery compensation was much greater because the regional harvest for Tanner crab would be reduced, but the harvest of halibut would not be affected by the closures.[56]

So too did the EA recognize that the "commercial value of the Glacier Bay Dungeness resource has been reduced to zero."[57] That fishery resource has been lost forever, because the law eliminated it entirely, while other fisheries (Tanner crab, salmon, and halibut) remained open to lifetime access permit holders.[58] Congress addressed this impact by making interim compensation available to Dungeness crab processors and

---

[55]     AR 150.
[56]     AR 151.
[57]     AR 68.
[58]     AR 178.

crewmen from "bought-out" Dungeness permit holders only.[59]  Again, the Final Plan did not provide that compensation distributions would be changed proportionately after all applications were in – it stated that "these dollar values [were] designated for each group within each category ...."[60]

Next, the Final Plan very precisely went through how the mechanics of compensation would work.  It used a hypothetical halibut fisherman, the dollar amount distributed to the halibut permit holder category in the Final Plan, and explained: "***Each application will then qualify for an equivalent percentage of the compensation designated for that category as calculated in the [EA].***"[61]  The Final Plan did not say that the amount calculated would be changed later after all applications were submitted.

The Final Plan detailed a hypothetical halibut permit holder "John W." who catches 22,500 pounds over 10 years.  This computes to 0.74% of the total 3,005,140 pounds caught, or $1,196,000 x 0.74% = $8,850 in compensation.[62]  One can easily use the Final Plan to compute this compensation.  With some fairly simple calculations from the EA, computed average dollars earned by "John W." can be compared with another hypothetical Tanner crab permit holder "Joe Q." with the same computations of dollars earned.  Hypothetical Tanner fisherman Joe Q. earns the same amount of money as John

---

[59]     AR 178-79.
[60]     AR 151
[61]     AR 152 (emphasis in original).
[62]     AR 152.  (The average price/pound of halibut was $1.76.  22,250 x $1.76 = $39,257 (EA page 31 (AR 53), table 3.2.)  The average value $530,250 divided by average pounds 300,514 = $1.7644.)

W., $39,257 over ten years.  He catches 17,120 pounds of Tanner crab over the ten year

period 1989-98.  This computes to 0.7279% of the total 2,351,910 pounds caught.[63]

      If one calculates Joe Q. with the dollar amounts allocated to the Tanner permit

holder category, he should receive 0.7279% of the $3,473,000, or $25,279.97.  With the

ratio the Park Service used in its two-page post Final Plan explanation (or the Park

Service's revision[64]), both permit holders would have received virtually the same amount

of compensation.  However, in the Final Plan the State of Alaska concurred in, John W.

would receive $8,850 and Joe Q. $25,279.90.

      The EA identified the average value of the Glacier Bay Tanner crab fishery at

$539,333 and the Halibut fishery at $530,250.[65]  Theses are almost identical in annual

average value.  However, in the Final Plan, the Tanner permit holder category was

allocated $3,473,000 versus $1,196,000 for Halibut permit holders.  Using the EA as the

guide, the Final Plan reads: "While the annual value of the Glacier Bay halibut and

Tanner fisheries are nearly equal, losses (and therefore compensation) in the Tanner crab

fishery are several times greater than in the halibut fishery."[66]

      The ratio of dollars earned to dollars compensated in the Halibut fishery was

identified by specific example in the Final Plan.[67]  If the same method is used for

---

[63]     The average price/pound of Tanner crab was $2.2931. (AR 40, (EA page 18, table 1.2) average value $539,333 divided by average pounds 235,191 = $2.2931/ pound average) is 17,120 x $2.2931 = $39,257.87 total earnings for 1989-98.

[64]     AR 237-38.

[65]     AR 40, 53.

[66]     AR 151.

[67]     AR 152, Table 4.  (The ratio of compensation to the halibut permit holders is estimated to be 0.225438 cents per dollar earned. (0.225438 x $39,257 = $8,850) and the ratio of

computing the ratio of dollars earned to dollars compensated for Tanner permit holders, it is obvious that the EA did in fact intend to compensate categories at different ratios. But the Park Service changed the designated amounts, and "shifted" the money around.

The Final Plan again calculated compensation for a hypothetical Tanner crab pot crew member using the money allocated to that category in the Final Plan.[68]   Again, the Final Plan very plainly provides: ***Each application will then qualify for an equivalent percentage of the compensation designated for that category as calculated in the [EA].***[69] The general public is not advised that any other method for distributing compensation would be used later.

The EA's Executive Summary[70] clarified that it "only attempts to measure economic losses to these groups." The EA predicted losses to different groups, and gave examples why different groups were to receive different amounts of compensation based on different losses between them.[71] The Park Service chose to use these defined and designated amounts to each category. The Final Plan states repeatedly that the EA is the guiding document and the Final Plan is specific in the examples it gives on how to compute compensation, and how funds designated to the individual categories were divided proportionally within the categories.

---

compensation to Tanner permit holders is estimated to be 0.643947 cents per dollar earned (0.643947 x $39,257.87 = $25,279.97).)

[68]    EA 153.
[69]    EA 153 (emphasis in original).
[70]    Appended to the Final Plan at AR 167.
[71]    AR 35.

The Final Plan could not be more clear to the reader, the public, and even to the Park Service that the "amount of compensation paid to an eligible applicant will be determined by the allocations detailed in this compensation plan as informed by the Economic Assessment."[72]  If compensation was to be proportional across the board, as indicated by Park Service witnesses, the Final Plan would have only needed to be two pages long, such as the one the Park Service developed after the fact, instead of the voluminous Final Plan, undergirded by the EA.

   5.   Process Before and After Final Plan and Testimony Regarding Development and Adoption of the Final Plan

The Park Service finalized the Glacier Bay Commercial Fishing Compensation Program, after extensive public comment, public meetings, meetings between government officials, a thorough economic analysis by the McDowell Group, and reviewing comments from the public and the State of Alaska.[73]  Former Alaska ADF&G Commissioner Frank Rue recalled that the process that resulted in his final, written concurrence in the final Compensation Plan in September 2001 was "very lengthy and involved workshops, internal discussions and meetings, public meetings, meetings with affected parties and state and federal agency officials, discussions with affected parties, and debate among affected interests."[74]  There were no public comments or meetings on the changed Park Service compensation plan.

---

[72]     AR 164 (emphasis added).
[73]     AR 143.  See also Lee testimony 7; former ADF&G Deputy Commissioner Robert Bosworth ("Bosworth") 124, former ADF&G Glacier Bay program manager HofMann 90, and former ADF&G Commissioner Frank Rue 140.  Rue Affidavit paragraph 10.
[74]     Rue Affidavit at paragraph 10.

To assist in managing what was to be an "intensive public process,"[75] the Park Service hired several persons to serve its Compensation Program Manager, ultimately landing on Ron Dick as its manager.[76] Mr. Dick acted under the supervision, direction, and approval of Superintendent Lee.[77] The State hired Richard HofMann as its Program Manager.[78] Mr. HofMann reported to ADF&G Deputy Commissioner Robert Bosworth, and ultimately was responsible to ADF&G Commissioner Rue.[79] The Park Service also hired a mediator to assist in the public, open process that resulted in the Final Plan.[80]

The Park Service had several rounds of public meetings in communities throughout the state.[81] Mr. Dick, as the Park Service's primary contact, met many times with Mr. HofMann, the state's contact.[82] Park Service communications to the state went through Mr. HofMann.[83] The meetings between the Park Service and the state were frequent, some lasting a full week, on average 2-3 days; these meetings lasted the better part of a year.[84] The Park Service "assumed that whenever Dick [HofMann] spoke, he was speaking for the state …."[85] However, Commissioner Rue made it clear that final concurrence with a Final Compensation Plan was his responsibility.[86]

---

[75]    Lee testimony 1-7.
[76]    Lee testimony 1-9.
[77]    Lee testimony 65.
[78]    Lee testimony 1-9.
[79]    Rue testimony 138.
[80]    Lee testimony page 8.
[81]    Lee testimony 10 (including Gustavus, Elfin Cove, Juneau, Pelican, Hoonah, Sitka, Petersburg, Wrangell, and Angoon).
[82]    Lee testimony 12.
[83]    Lee testimony 14.
[84]    Lee testimony.
[85]    Lee testimony 16.
[86]    Rue Affidavit, paragraph 6; Rue testimony 139.

After the preliminary plan came out, it was at least a year until the Final Plan was published.[87]  The release of the preliminary plan required another round of public comment.[88]  These public meetings resulted in quite a few changes to the preliminary daft plan before it was finalized.[89]  When the Park Service made changes to the plan before it became final, such as deleting age-weighted compensation, it did so after public meetings, and before ADF&G Commissioner Rue concurred in the Final Plan.[90]

To the public's view, the Final Plan opted to set up categories of compensation.[91]  Had the Park Service decided that all payments were to be proportional among all participants, the Final Plan could have been reduced to the two pages that in fact, became the final compensation plan used by the Park Service to pay out compensation.[92]  There would have been no need to have any analysis on losses to any of the fisheries. The use of detailed losses allocated to specific categories of claimants is what the State of Alaska concurred with.

The allocation of loss ties into how the Final Plan explains losses between different categories such as Tanner crab and halibut fishermen. Commissioner Rue understood that the Final Plan identified different groups of people and treated them differently.  For example, Commissioner Rue recalled that the halibut and Tanner crab fisheries were treated differently with Tanner crab fishermen getting substantially more

---

[87]     Lee testimony.
[88]     Lee testimony 15.
[89]     Lee testimony 15.
[90]     Lee testimony 15-16.
[91]     Lee testimony 28.
[92]     AR 237-38.

than halibut fishermen because an area closed to Tanner crab would put that resource off limits because you couldn't harvest it elsewhere, resulting in the guideline harvest level going down.[93]   No such impact was discerned for the halibut fishery.[94]   That understanding, in fact, mirrored the Final Plan.[95]

The guiding principle of the plan according to Superintendent Lee was not to prioritize or set categories of some grouping more important than others, and to be as consistent across the board as it could be.[96]   She testified that because there was a finite amount of money to distribute, the Park Service was going to have to compensate proportionately to past earnings.[97]   Superintendent Lee used halibut as an example,[98] as a way the Park Service wanted to proportionately pay folks, so that if they proved that they made a certain amount from Glacier Bay, then an applicant's proportion of the compensation pie would be a certain number of dollars.[99]

6.    After the Application Period Closed, Park Service Asserts it Can Make After-the-Fact Changes in the Final Plan

Compensation applications were due on January 28, 2002.[100]   The Park Service wanted to consider all compensation applications at the same time.[101]   No payments were to be made until all administrative appeals were decided.[102]   The Final Plan does not

---

[93]    Rue testimony 152-54.
[94]    AR 151.
[95]    AR 151.
[96]    Lee testimony 18.
[97]    Lee testimony 18.
[98]    Lee testimony 19.
[99]    Lee testimony 20.
[100]   EA 159.
[101]   EA 158.
[102]   AR 164.

provide that the Park Service needed to consider all applications and then make adjustment to compensation amounts on a proportionate basis, and nowhere in the Final Plan is that kind of process discussed.

Superintendent Lee was the person charged with making final determinations for each application, "based on the compensation plan and the information provided by each applicant."[103]  Nothing in the Final Plan indicates that final determinations would be made or changed after all applications were submitted.  The Final Plan reiterates unequivocally that the "amount of compensation paid to an eligible application will be determined by the allocations detailed in this compensation plan as informed by the Economic Assessment."[104]

Notwithstanding Superintendent Lee's after-the-fact rationalization of the changes that the Park Service made to the Final Plan, when the Final Plan came out, the compensation money was put into categories.[105]  It was Superintendent Lee's view that the numbers in the Final Plan categories came from the EA,[106] which "states very clearly that those are estimates and we … would not know exactly what the real losses were until we received the applications and made our determinations [of compensation]."[107]

"The economic assessment says that we would not know until we … ended up getting the applications what the actual losses were and at that time we would have to

---

[103]     AR 164.
[104]     AR 164 (emphasis added).
[105]     Lee testimony 21.
[106]     Lee testimony 21.
[107]     Lee testimony 21.

make the decisions."[108]  "We have to wait until we got all of the claims in and then we had to look at how may claims we had, how much money we had and then we went through and  -- and split it proportionately."[109]  "We were going to have to do this proportionately -- compensate people proportionately and that those things that were identified in the economic assessment, those categories and again in the plan, that we would have to make some adjustments based on the fact that those were gross estimates from McDowell Group."[110]

This view is not supported by the EA, or by the sworn statement of the principal author of the EA, or expressed anywhere in the Final Plan.  Jim Calvin is an economist at the McDowell Group and was the principal author of the Glacier Bay Compensation Plan EA, which it prepared for the Park Service.  He swears under oath that the "EA did not recommend or anticipate that the amounts in the categories of compensation in the final plan would be completely changed after applications for compensation were received and reviewed."[111]

## V.     The Final Plan as Changed by the Park Service

Only after the McDowell Group completed the EA, public meetings held, citizens heard, the state's concurrence in the Final Plan memorialized, was the Final Plan published.  No one who prepared the EA or participated in the public hearings or who

---

[108]     Lee testimony 21-22.
[109]     Lee testimony 22.
[110]     Lee testimony 23.
[111]     Affidavit of Jim Calvin, paragraphs 1 & 3.

relied on the compensation categories as set forth in the Final Plan knew it, but the Park

Service was hatching a new and radically different plan.

      A.      <u>Where the Revisions Came From</u>

According to Superintendent Lee's long-after-the-fact testimony, she thought all

along that the Park Service was "going to have to make some <u>real changes</u>," because "we

would not know what the amounts were going to be … until we got the applications.[112]

That differed from her later testimony that they "didn't change" things, they "shifted"

money around.[113]  The definition of "shift" is "change."[114]

The EA's Executive Summary clarified that it "only attempts to measure

economic losses to these groups." [115]  The EA predicted losses to different groups, and

gave examples as to why different groups were to receive different amounts of

compensation based on different losses between them.[116]  The Park Service chose to use

these defined and designated amounts for each compensation category.  Superintendent

Lee testified that the McDowell Group was the best economic group when it came to

commercial fishing and Southeast issues.[117]  The Final Plan states repeatedly that the EA

is the guiding document, the Final Plan is specific in the examples it gives on how to

---

[112]     Lee testimony 26 (emphasis added).  Individuals were apparently awarded money based upon the Park Service's notion of proportionality based upon what they earned from Glacier Bay fishing.  Lee testimony 28.  The Park Service apparently intended to compensate in this manner all along, but did not specifically state that in the Final Plan.

[113]     Lee testimony 54, 75-76.

[114]     <u>American Heritage Dictionary</u> 1194 (1969).

[115]     Appended to the Final Plan at AR 167.

[116]     AR 35.

[117]     Lee testimony 32.

compute compensation, and the Final Plan is specific how funds designated to the individual categories were divided proportionally within the categories.

      B.    <u>The Park Service Misused "Proportionality" to Justify Changes.</u>

The Park Service focuses on the concept of proportional payments as its excuse for the after-the-fact changes it made, but it misuses the concept. Superintendent Lee referred to two points within the Final Plan that provide that compensation to permit holders and processors is proportional to past earnings from Glacier Bay.[118] However, that proportionality is defined, fleshed out, and explained later in the Final Plan that compensation is proportional within each individual category, not blanketed across all categories.[119] Compensation in the Final Plan was not intended to be proportional across the board dollar for dollar among all categories or participants, but proportional within each category by those in each category. That was what was presented in the Final Plan and that is what the state concurred in. And the general statements on one page of the Final Plan related to compensation proportional to past earnings,[120] did not give the Park Service carte blanche to change the Final Plan without the State's concurrence, particularly in light of the very specific compensation value assigned to specific groups of affected categories.[121]

Superintendent Lee described that the Park Service made changes to the Final Plan, in one instance shifting "money from the crewmembers to, for example, the

---

118     AR 147.
119     AR 149-53.
120     AR 147.
121     AR 149, 159, 151.

halibut."[122]  The Park Service was shifting money so that the Park Service could pay everyone proportionately.

        C.      <u>What the State Knew about the Revised Plan</u>

Nothing.  The Park Service has presented no evidence that it: a) informed the state that it harbored reservations about the workability of the published Final Plan; b) sought the state's input in making revisions to the Final Plan, or; c) followed Congress' directive to develop a compensation program with the concurrence of the state.  Superintendent Lee did not recall ever telling Mr. HofMann what the final allocation, the specific numbers, would be, only that the estimates were off, but never that the Park Service was "change[ing] X number of dollars to Y."[123]

Superintendent Lee did testify in support of the scheme the Park Service used to pay compensation, that it was going to have to "shift" money from one category to another so it could pay everyone proportionately.[124]  Superintendent Lee testified that she told Mr. HofMann that there was going to be a shifting of money around from categories.[125]  Superintendent Lee talked with Mr. HofMann after the applications came in, but did not show him final payout figures or proportionate payment calculation; she did indicate there was a difference between the Final Plan categories and the applicants.[126]

---

[122]      Lee testimony 36.
[123]      Lee testimony 35-36
[124]      Lee testimony 36.
[125]      Lee testimony 36.
[126]      Lee testimony 34.

However, the person that mattered was Commissioner Rue, as he was the person responsible for giving final State of Alaska concurrence to the compensation plan contemplated by Congress.[127]  Commissioner Rue testified that he did not understand that after he gave his concurrence to the Final Plan in September 2001, that money would be moved around in the categories.[128]  Importantly, Commissioner Rue testified that he did not concur with moving money around after the Final Plan, and more broadly, did not concur with anything the Park Service did to the Final Plan after it came out in September 2001.[129]  Had Commissioner Rue understood that the "Distribution" developed after the Final Plan significantly changed the Final Compensation Plan that he had concurred with, he would not have concurred with a new strategy unless it had "involved the public and affected parties had a meaningful opportunity to comment."[130]

In contrast to Commissioner Rue's pivotal policy role for the State of Alaska, Mr. HofMann's jobs included informing the public of the development of this plan,[131] and, as he put it, "to keep the public process open."[132]  Mr. HofMann's understanding was that "all claims would be prorated on an equal basis," that if a person documented "$10,000 in [a] claim, they would get 75 cents on the dollar …."[133]  The assumption of

---

[127]    Rue Affidavit paragraph 4.
[128]    Rue testimony 154.
[129]    Rue testimony 154.
[130]    Rue Affidavit, paragraph 21.
[131]    Richard HofMann testimony 90.
[132]    HofMann testimony 90.
[133]    HofMann testimony 96.

proportionality, at least in Mr. HofMann's mind, applied across "all categories and all claimants, everybody."[134]

He explained that the purpose of going to the public with "all these numbers about categories was to explain that was how the McDowell group estimated it."[135]  He also described that he, among others, decided to make the category numbers public:  "It was part of our public process to take the data we acquired and put it before the public for discussion."[136]

Mr. HofMann testified that in his conversations with individuals, they would ask him if that was all the money that was going to be in the compensation plan and he would explain that is how the McDowell Group expects it could break out: "it's going to depend on how the actual claims all total out once they're all amassed."[137]  According to him, fund distribution numbers and McDowell's EA were presented as "a talking point but it was not there as a hard figure."[138]  That was something Mr. HofMann felt he had to "constantly explain," but it was not in the Final Plan.[139]

This is a troubling dichotomy between Mr. HofMann's notion of what the Final Plan "is" to him and what it "is" to the public.  To the public relying on the Final Plan,

---

[134]     HofMann testimony 97.
[135]     HofMann testimony 97.
[136]     HofMann testimony 98.
[137]     HofMann testimony 99.
[138]     HofMann testimony 99.
[139]     HofMann testimony 99.

the manner of compensation was detailed there, and was not, could not have been, and should not have been, contingent on a chat with Mr. HofMann.  Nothing in the Final Plan indicates that the potential applicant should have a private conversation with Mr. HofMann or anyone else for a caveat on the method that would ultimately be used to pay out compensation by the Park Service.

Superintendent Lee stated that the compensation program was not intended to make anyone rich, or make a lot of millionaires.[140]   But it was never explained to Commissioner Rue by the Park Service or his staff that the intent of the Final Plan was not to make people rich or millionaires.[141]  Her statement implies the Park Service's intention to change the Final Plan because she and Mr. Dick did not like the outcomes that were being generated under the Final Plan.  This would certainly appear to be arbitrary and capricious actions by the Park Service determining whom they felt should receive too much or too little compensation, beyond the terms of the Final Plan.

Under the September 2001 Final Plan, the public was on notice of its contents and knew in advance the compensation allocated to their claim category; one could plug in a claimant into their respective categories as defined in the Final Plan.  However, the Park Service chose to re-write the Final Plan to accommodate its idea of proportionality after reviewing how much some people were in line to receive under the Final Plan.  This put the lie to the Final Plan, an open public process, and completely eliminated the

---

[140]     Lee testimony 29.
[141]     Rue testimony 146.

application of the amounts allocated to categories, using hypothetical examples of halibut and Tanner crew claimants.[142]

Superintendent Lee said the Park Service carried over the proportional compensation formula it developed after receiving applications, which differed from the categories of compensation set forth in the Final Plan, and "if we were to do it over again, we would not have carried it over ...."[143]

The troubling part of the Park Service changing the formula from what was in the Final Plan is that apparently it knew from the beginning that it would be proportional to past earnings, but it divided the compensation into different categories in the Final Plan.[144]  The Park Service expected changes to the Final Plan to occur, and expected the Final Plan to be wrong, but claimed that in the back of the Final Plan that people would be compensated proportionately and that "it was our fault for not being more clear with that."[145]  "The economic assessment does say that the categories were estimates and that we would not be able to come up with the firm figures until such time as we got the application.  Looking back…it would have been far better had we not put any of those graphs in and so forth."[146]

The Park Service thought that by putting in all the categories in the Final Plan, it would provide people with an understanding about the maximum about it thought that

---

[142]    See AR 152 (hypothetical halibut permit holder compensation award) and AR 153 (hypothetical Tanner pot crew compensation award).
[143]    Lee testimony 28-29.
[144]    Lee testimony 30.
[145]    Lee testimony 30-31.
[146]    Lee testimony 31.

would be available in any category, or any group of people.[147]  Superintendent Lee

acknowledges that the Park Service took the compensation amounts directly out of the

EA.[148]  Yet she read the Final Plan and the EA together, and then came to the conclusion

that was "very clear" that there would have to be some adjustments and believed that this

was acknowledged in the EA and in the Final Plan.[149]

As opposed to being poor or lousy estimates, the estimated losses and impacts

identified in the EA were actually very good.  The EA identified different levels of losses

to different fishery/processor groups based on immediate results, from closing the

Dungeness fishery completely and immediately, as evidenced by Congress

acknowledging it as the only fishery eligible for interim compensation, compared to

others who can still fish with Lifetime Access Permits and the different levels of losses to

different categories.[150]

> D.    Making Changes to the Final Plan

> 1.    How the changes were accomplished and made known

The State of Alaska made it known that it did not want to get involved in

individual compensation amounts or disputes.[151]  After people were notified of their

compensation estimates by Superintendent Lee, they were advised that they could appeal

her decision on how much compensation or appeal their eligibility.  But claimants were

---

147     Lee testimony 31.
148     Lee testimony 32.
149     Lee testimony 32.
150     See, e.g., AR 68 (Dungeness crab fishery)
151     Rue Testimony 171; Bosworth Testimony 106-07. "That was the Park Service's responsibility so I was more interested in fairness, process, that kind of thing."

also advised that the issues they could appeal were limited to "eligibility for compensation" and that only the superintendent's decision regarding eligibility for compensation or the amount of compensation awarded could be appealed. "No evidence regarding challenges to the Compensation Plan itself such as allegations that the plan is unfair" was allowed.[152]  Thus, the Park Service did not allow challenges to the Final Plan, or its changes.  It was only after the appeals did people find out how much they actually were compensated as the money wound up in their bank accounts and they received the decision of their appeal and what their final compensation was in March 2003.[153]

Only after the money in the Final Plan was changed did the Park Service send out letter to folks who had applied,[154] and put the information on the changes on the web site.[155]  That was all done after the Park Service made the final decision on compensation,[156] after the State concurred with a different Final Plan, and after the public relied on a Final Plan the Park Service did not use.  That amounts to bait and switch.

2.     How the changes should have been accomplished and made known

No one was advised in writing or orally or in the Final Plan that once an application had been submitted, there would be a complete reallocation of money in the categories.[157]  Those who submitted claims were not advised in the Final Plan that all the

---

[152]     AR 949-50, Notice of Hearing for Icy Passage Fish.
[153]     AR 228.
[154]     Lee testimony 36.
[155]     Lee testimony 37.
[156]     Lee testimony 37.
[157]     Lee testimony 48.

categories would be completely redone.[158]  The Park Service thought it was self-explanatory.[159]  The Final Plan does not say that the Park Service will make real changes in the Final Plan based on the application were submitted to the Park Service.[160]  The Final Plan does not state anywhere that the Park Service will wait until all the compensation applications are received and then it will advise the applicant that it changed everything in the categories.[161]

It is clear from the record that when the Park Service reached a major milestone or change in the compensation plan as it worked through the process, it would seek and obtain a written letter of concurrence from the state.  For example, ADF&G was clear in its letter of concurrence with the Park Service to forward the plan to OMB, that it "will need to see what changes, if any are made at OMB before considering final concurrence."[162]  When the Park service prepared a "redo" of the Final Compensation Plan after 2001, it did not obtain a written concurrence from the State of Alaska.  Neither Commissioner Rue, nor Mr. Bosworth provided a written concurrence.  Superintendent Lee testified that that the Park Service could do this redistribution or re-split the compensation plan, because ADF&G's concurrence of the Final Plan subsumed

---

158     Lee testimony 48-49.
159     Lee testimony 49.
160     Lee testimony 50.
161     Lee testimony 53.
162     AR 246.

concurrence.[163]  There is no concurrence from the state, because it was not a change in how the Park Service had discussed with the state all along.[164]

Anytime the Park Service was faced with a change or anything of magnitude, Superintendent Lee said it did go to the state.[165]  Commissioner Rue, however, was of the view that when he had provided a concurrence in the Park Service's Final Plan, he made sure that there was a document that would memorialize exactly what the State of Alaska concurred with, and that his concurrence was in writing.  There is nothing that indicates the state concurred with what the Park Service subsumed the state concurrence.

E.    The State of Alaska Did Not Concur with the After-the-Fact Changes.

Unlike Commissioner Rue's written concurrence with the Final September 2001 Plan, the State of Alaska did not concur with the after-the-fact changes made by the Park Service, nor with it's revised misuse of the concept that the Plan be "proportional."  This is clear from an examination of the testimony.

1.    Mr. HofMann's Testimony

In assessing whether the State of Alaska concurred with the after-the-fact changes made to the Final Plan, it is helpful to consider the testimony of Richard HofMann.  In doing so, it is necessary to keeping in mind that he was the staff-level liaison for the ADF&G who worked on Glacier Bay compensation issues, not a policy-maker, like the Commissioner.

---

[163]    Lee testimony 80.
[164]    Lee testimony 80.
[165]    Lee testimony 81.

Mr. HofMann said he talked about having to amass all claims together on their total value before "we could figure out how much to pay out."[166] "Throughout the entire process proportionality was going to determine the level of claim or payment abased upon how much we have to distribute."[167] Mr. HofMann said he told that to Commissioner Rue before Commissioner Rue signed off on the Final Plan.[168] Mr. HofMann had no doubt in his mind about that.[169] Mr. HofMann also said that he didn't believe that the state even concurred that the McDowell Group numbers would be the basis for distributing the funds.[170] When it was pointed out to him that the state concurred with the Final Plan where it says the McDowell report is the guiding document for the Final Plan, he guessed that it was "an oversight" on his part that he should have had the state's lawyers look at it more closely.[171] Mr. HofMann also said that that the funds in the Final Plan's categories were estimates but until all those claims were in one place, the prorating could not be established.[172]

Several things about Mr. HofMann's role in the Glacier Bay compensation process, and concerns about his lack of familiarity with the Final Compensation Plan, the process, and understandings of Glacier Bay compensation are important to note. First, Mr. HofMann did not have authority from Commissioner Rue, the State of Alaska, or

---

[166]    HofMann testimony 103.
[167]    HofMann testimony 104.
[168]    HofMann testimony 105.
[169]    HofMann testimony 105.
[170]    HofMann testimony 113.
[171]    HofMann testimony 113.
[172]    HofMann testimony 115.

within ADF&G "to concur on behalf of the State of Alaska or ADF&G in a Park Service Compensation Plan for Glacier Bay related to commercial fishing impacts."[173]

Second, Mr. HofMann is an accomplished fisherman.  But he had no government employment experience and was not familiar with workings of government in that capacity beforehand, so his understanding of his role, and what the Park Service was doing to change the Final Plan was probably not fully appreciated.  The information passed to him about changes to the Final Plan that the Park Service made after the Final Plan came out, appears not to have been realized, or its import was not noted.[174]

For example, Mr. HofMann testified that he apparently knew that money would have to be distributed differently than what was in the EA and the Final Plan to keep it proportional.[175]  Mr. HofMann did not seek written concurrence from Commissioner Rue on that point because that concept had been discussed and "was in our minds" when the concurrences were signed.  This is troublesome, because the public cannot read the minds of government employees; it could read the Final Plan.

Mr. HofMann's testimony is also a direct contradiction of Commissioner Rue's (and, in turn, State of Alaska) policy, which required (or at least resulted in) written concurrences and no departures from the Final Plan without a public process.[176]  When Commissioner Rue provided a concurrence in the Park Service's Final Plan, he, as "the

---

[173]     Rue Affidavit paragraph 13.
[174]     See, e.g., Exhibit A.  Mr. HofMann commercially fished for 21 years before coming to ADF&G.
[175]     HofMann testimony 115.
[176]     Rue Affidavit paragraphs 18, 21.

representative of the State authorized to provide the State's concurrence, made sure that there was a document that would memorialize exactly what the State of Alaska concurred in" and that his "concurrence was in writing."[177]

Third, Mr. HofMann was hired to be the Program Manager for development of the Final Plan. As such, he worked closely with the McDowell Group that prepared the EA, and was involved in getting the Final Plan to its final concurrence in 2001 by the Commissioner.[178] He testified that the EA "was not the guiding document for the distribution of the funds."[179] This testimony is clear evidence that Mr. HofMann did not understand the Final Plan or how it was developed. The Final Plan could not be more clear that the "EA serves as the guiding document for the distribution of funds in" the Final Plan.[180] This is a fundamental misunderstanding of the basis for the Final Plan by Mr. HofMann.

Fourth, when shown the document that detailed the distribution of funds used by the Park Service, which calculated its proportional payment method (the "redo" of the Final Plan), Mr. HofMann recognized it incorrectly as something out of the McDowell EA.[181] Ultimately, he testified that the state did not concur in writing in the Park Service's redo of the Final Plan.[182] This failure to appreciate exactly what was used to

---

[177]    Rue Affidavit paragraph 18.
[178]    HofMann testimony 90.
[179]    HofMann testimony 102, 111.
[180]    AR 146. The Plan states "that compensation [in the Final Plan] will be guided by the Economic Assessment." AR 149.
[181]    HofMann testimony 109.
[182]    HofMann testimony 112-13.

guide the Final Plan, or appreciate what was in the EA or the Final Plan is troubling in the context that Mr. HofMann was the Glacier Bay Program manager for ADF&G. These lapses underscore the lack of meaningful understanding by ADF&G of what the Park Service really did, or the method it really used to pay compensation, and how much that method really differed from the Final Plan that Commissioner Rue concurred with. It certainly appears that if Mr. HofMann was the conduit of information from the Park Service up to Mr. Bosworth and finally to Commissioner Rue, correct information was not being provided to those responsible for the State's concurrence.

Fifth, Mr. HofMann testified that he had discussed changing the money in the categories and that proportionality was going to determine the level of claim or payment based on how much money there was to distribute with Commissioner Rue[183] prior to signing the letters of concurrence and throughout the entire process before Commissioner Rue signed off on the Final Plan. This testimony again contrasts starkly with Commissioner Rue's. Had Commissioner Rue understood that the "Distribution" significantly changed the Final Compensation Plan, which was changing the money in the categories and that proportionality was going to determine the level of compensation, he would not have concurred with a new strategy unless it had involved the public and affected parties had a meaningful opportunity to comment.[184] To bolster that observation, Commissioner Rue testified that he did not recall any conversations with Mr. HofMann

---

[183]    HofMann testimony 103-05.
[184]    Rue Affidavit paragraph 21.

and Mr. Bosworth about paying people proportionately, and was not even sure what proportionate payments meant.[185]

### 2. Commissioner Rue's Testimony

Significantly more important than Mr. HofMann's testimony is the testimony of Commissioner of ADF&G, the policy-maker for the State of Alaska on this compensation program.[186] The following all lead to the inescapable conclusion that the State of Alaska did not concur with the Park Service's after-the-fact changes to the Final Plan.

After the Final Plan was concurred in, Mr. Bosworth did not anticipate that the Park Service's redistribution plan would have happened 6 months later.[187] He also testified that if there had been a substantial rewrite of the Final Plan, the state and the fishermen and all parties would have insisted on the public process.[188]

Commissioner Rue is clear that he was responsible for the state's concurrence on the final compensation plan.[189] He was also clear that concurrences were to be in writing.[190] He said that discharging the state's duty to concur was important and it ought to be in writing.[191]

---

[185]     Rue testimony 163-64.
[186]     To a lesser extent, former Deputy Commissioner Robert Bosworth added some interesting things.
[187]     Rob Bosworth testimony 126.
[188]     Bosworth testimony 128.
[189]     Rue Testimony 134.
[190]     Rue Testimony 134.
[191]     Rue Testimony 138.

Commissioner Rue testified that he had final concurrence authority,[192] and that Mr. HofMann did not have authority to concur for the state on the plan.[193] Commissioner Rue testified that the state worked hard to involve the public in decisions: it was the "bedrock" of how the state proceeded.[194]

Commissioner Rue never saw the Park Service's redo of the Final Plan when he was commissioner[195] and that it was never explained to him what it would do in terms of distribution.[196] He did not remember seeing any of it or discussing it.[197]

Commissioner Rue did know and understood that the EA was the guiding document for the distribution of funds in the EA. He did not recall discussion that what he concurred in as the Final Plan would be entirely changed after the Final Plan was distributed to the public.[198] He never heard that there would not be a way that determination of compensation could be made until all the claims and applications were in, and after everything was redone.[199]

Commissioner Rue would have talked with Mr. Bosworth and Mr. HofMann if there had been a departure from the Final Plan, and ensured the public had input on it.[200]

---

[192]    Rue Testimony 139.
[193]    Rue Testimony 139.
[194]    Rue Testimony 141.
[195]    Rue Testimony 146.
[196]    Rue Testimony 146.
[197]    Rue Testimony 147.
[198]    Rue Testimony 148.
[199]    Rue Testimony 148.
[200]    Rue Testimony 148.

He didn't understand that the method of payout would have to be constantly explained to claimants because it was going to be different than what was in the Final Plan.[201]

Commissioner Rue did not concur that the Final Plan would be changed after September 2001; once he concurred he thought that was it.[202]  His understanding was that the Final Plan guided compensation and that it would be paid out as the Final Plan said.[203]  He also did not understand that once the compensation claims were in that the claims would be split proportionally and not according to the categories set up in the Final Plan.[204]  He never had a conversation with anyone in ADF&G or with Park Service about moving money around and compensating people proportionately once concurrence signed.[205]  He testified that Mr. HofMann did not describe changing money around between categories was going to occur and who it would affect.[206]

Mr. Bosworth and Mr. HofMann's offices were located closely to Commissioner Rue's and if they wanted to talk with Commissioner Rue about something in the compensation plan they could have.[207]  He expected Mr. HofMann to brief him on important parts of the Final Plan.[208]  He also did not recall discussing proportional

---

[201]    Rue Testimony 149.
[202]    Rue Testimony 149.
[203]    Rue Testimony 149.
[204]    Rue Testimony 150.
[205]    Rue Testimony 150.
[206]    Rue Testimony 151.
[207]    Rue Testimony 160.
[208]    Rue Testimony 161.

payments with Mr. HofMann and Mr. Bosworth.[209]  Finally, he did not remember going over a dollar for dollar calculation of money payments, as discussed by Mr. HofMann.[210]

Commissioner Rue didn't recall Mr. HofMann or Mr. Bosworth coming to him after his concurrence and discussing any issues they thought were major.[211]  He said they did not come to him about changing money and pots.[212]  He believed that changes from one category or another would require the public to see it, and whether the public had an opportunity to see it and give input.[213]

## VI.    Conclusion

Congress appropriated $23 million to compensate those negatively affected by commercial fishing closures and restrictions in Glacier Bay.  It further provided that a plan developed by the Park Service to distribute that compensation requires concurrence from the State of Alaska.

The State of Alaska did concur with the Final Glacier Bay Compensation Plan in September 2001.  That Final Plan was published and distributed to the public.  However, the State it did not concur with the substantial changes the Park Service later made to how the money would be allocated among compensation categories – which changes were not made until all the applications had been filled out and submitted by those affected.  When the State concurred with Park Service actions, it did so in writing.

---

[209]    Rue Testimony 164.
[210]    Rue Testimony 164.
[211]    Rue Testimony 168.
[212]    Rue Testimony 168.
[213]    Rue Testimony 170.

Because the State did not concur with changes made to the Compensation Plan by the Park Service after September 2001, the plaintiffs should be compensated according to the Final Compensation Plan that was finalized and concurred in by the State in September 2001. Any changes made after the Final Compensation Plan was published in September 2001 should be ruled as void, and having no effect.

DATED this 11th day of January, 2006

**LAW OFFICE OF BRUCE B. WEYHRAUCH, LLC**

By:    <u>/s/ Bruce B. Weyhrauch</u>
       Bruce B. Weyhrauch,
       Of Attorneys for Plaintiffs
       114 South Franklin Street
       Suite 200
       Juneau, Alaska 99801
       Phone: (907) 463-5566
       Fax (907) 463-5858
       E-mail: <u>whyrock@gci.net</u>
       Alaska Bar Number: 8706057

<u>**CERTIFICATE OF FILING AND SERVICE**</u>

The undersigned certifies that on this 11th day of January, 2006, a copy of the foregoing and Affidavit of Jim Calvin were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the court's electronic filing system. Parties may access this filing through the Court's system. I also certify that I e-mailed a copy of the foregoing to:

Ms. Susan Lindquist, Assistant U.S. Attorney
Federal Bldg & US Courthouse
222 West Seventh Ave. #9 Room 253
Anchorage, Alaska 99513-7567
susan.lindquist@usdoj.gov

                         <u>s/ Bruce B. Weyhrauch</u>