326.398
cms
pleading

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| DANIEL H. WESTCOTT, JR., and DAN FOLEY, d/b/a ICY PASSAGE FISH, ) ) ) ) | |
| Plaintiffs, ) ) | 1:03-cv-00009 JWS |
| vs. ) ) | ORDER FROM CHAMBERS |
| DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, ) ) ) | [Re:   Motions at dockets 36, 41, 71] |
| Defendant. ) ) | |

## I. MATTER PRESENTED

This order addresses the last issue presented by the motion for summary judgment Daniel H. Westcott, Jr., and Dan Foley, d/b/a Icy Passage Fish, filed at docket 36 and supplemented at docket 41. It includes citations to the transcript from two evidentiary hearings. The first was held at Juneau, Alaska, on November 15, 2005, and the second was held at Anchorage, Alaska, on December 2, 2005. Tomie Patrick Lee, Richard HofMann, and Robert Bosworth testified at the first hearing. Francis J. Rue testified at the second. The court also heard oral argument on this issue.

This order also addresses the motion to strike filed by the National Park Service ("NPS") at docket 71. That motion targets affidavits by Rue and Jim Calvin submitted by Westcott and Foley in support of their motions at dockets 36 and 41. The motion at docket 71 has been fully briefed. Oral argument was not requested on the motion at docket 71 and would not assist the court.

## II. BACKGROUND

Congress restricted commercial fishing in waters within Glacier Bay National Park in 1998. The next year, it set aside $23 million "for a program developed [by the NPS] with the concurrence of the State of Alaska to fairly compensate United States fish processors, fishing vessel crew members, communities, and others negatively affected

by restrictions on fishing in Glacier Bay National Park."[1]  The NPS sponsored two rounds of public discussions on what the compensation plan should entail.

The NPS and Alaska officials most involved in the discussions were Lee and HofMann.  Lee, the Superintendent of Glacier Bay National Park, testified that she was the NPS official in charge of developing the plan[2] and that she communicated with Alaska "almost exclusively" via HofMann[3] and "assumed that whenever [HofMann] spoke, he was speaking for the state."[4]  HofMann, a commercial troller before being hired by Alaska, testified that he was "the state's representative" to the NPS.[5]  That description is supported by the testimony of Rue, then the Commissioner of the Alaska Department of Fish and Game ("ADF&G").  Rue explained that HofMann was Alaska's "point person" and "direct link" to the NPS.[6]  He also testified that although he was the only person authorized to give Alaska's concurrence in any plan,[7] he relied on HofMann to come to him when his concurrence was needed.[8]

After the second round of discussions, the NPS created a compensation plan and twice submitted it to Alaska.  The first time, in May of 2001, was for receiving Alaska's concurrence in the agency's decision to forward the plan to the federal Office of Management and Budget ("OMB") for the OMB's approval.  The NPS obtained Alaska's concurrence in a letter to Lee dated May 14, 2001, and signed by HofMann and Bosworth, who was Deputy Commissioner of the ADF&G.[9]  The NPS received OMB's approval and resubmitted the plan to Alaska for the state's concurrence in using

---

[1] Pub. L. 105-277 (1998), 112 Stat. 2681-259, amended by Pub. L. 106-31 (1999), 113 Stat. 72 – 73 (codified as a note at 16 U.S.C. § 410hh-4).

[2] Doc. 64, 1-4:13-19.

[3] Id., 1-15:2.

[4] Id., 1-15:7-10.

[5] Id., 1-84:24.

[6] Id., 2-158:14-15.

[7] Id., 2-138:17-21.

[8] Id., 2-166:10-14, 2-176:4-8.

[9] Doc. 62, ex. E.

the plan to distribute the $23 million set aside by Congress. Alaska gave its concurrence in a letter to Lee dated September 5, 2001, and signed by Rue.[10]

Later in September of 2001, the NPS made the plan public and invited participants in commercial fisheries in Glacier Bay National Park to apply for compensation.[11] The application period closed on January 28, 2002, with 1,027 applications submitted.[12] After evaluating the applications, the NPS sent letters to participants informing them of the agency's decision on their applications and posted an explanation of how it calculated compensation awards on its website.[13]

To Westcott and Foley, that explanation appeared to differ from the plan released in September of 2001. The explanation indicates that the NPS awarded money to every qualified participant at the same ratio of compensation per dollar of past earnings from commercial fishing in Glacier Bay National Park, and the parties agree that was, in fact, what happened. Westcott and Foley contend that the equal-ratio method was a departure from the September 2001 plan, which they read as awarding greater compensation per dollar of past earnings to participants in some fisheries than to participants in other fisheries.

Rue's testimony and the plan itself provide some support for their reading. Rue believed that under the plan, some participants stood to receive relatively more compensation than others because the commercial fishing restrictions affected them more than others.[14] As for the plan, it allocated money by fishery and stated that certain fishery categories would receive more money than others, even when the value of the underlying fisheries was nearly equal, because losses due to the restrictions were greater in some fisheries than in others.[15] It also awarded compensation to participants in a given fishery based on their performance relative to other participants in that

---

[10] *Id.*, ex. I.

[11] Doc. 33, Administrative Record, Vol. 1, p. 141.

[12] *Id.*, Admin. Rec., Vol. 2, p. 234.

[13] Doc. 64, 1-34:11-17.

[14] *Id.*, 2-172:2-173:15.

[15] Doc. 33, Admin. Rec., Vol. 1, p. 151.

-3-

fishery.[16] The conclusion Westcott and Foley drew from the plan is that a participant in one fishery whose harvest was of approximately equal value to the harvest of a participant in another fishery, but whose fishery was more negatively impacted by the fishing restrictions, would receive more compensation relative to his earnings than the other participant.

The NPS argues that its explanation of the way it calculated compensation awards was consistent with the September 2001 plan. Its view is supported by HofMann and Lee's testimony. According to both of them, the September 2001 plan, like the NPS's explanation, awarded money to all participants at the same ratio of compensation per dollar of past earnings.[17] Still, Lee acknowledged that after the application period closed, the NPS made "real changes" to the amount of money in each category listed in the September 2001 plan.[18] However, she explained that those changes were expected because the amount of money designated for each category was based on assumptions about the numbers of participants in each category.[19] Once the applications arrived, according to Lee, the NPS realized that fewer participants than expected actually had applied.[20] If the NPS had not "adjust[ed]" the amount of money for each category, Lee testified that some participants would have received "a smaller proportion [of compensation] based on their past earnings" than others.[21]

Lee testified that she told HofMann about the discrepancies between the estimated and actual numbers of applicants and that the NPS was "going to have to make changes"[22] to the funds set aside for each category. She did not recall telling him about specific numbers, but she was sure he knew what was happening in general[23]

---

[16] *Id.*, Admin. Rec., Vol. 1, p. 152.

[17] Doc. 64, 1-26:1-17 (Lee); 1-90:22-92:13, 1-94:6-21, 1-96:20-97:14 (HofMann).

[18] *Id.*, 1-24:20.

[19] *Id.*

[20] *Id.*, 1-24:7-25:23.

[21] *Id.*, 1-25:17-18.

[22] *Id.*, 1-33:18-34:2.

[23] *Id.*, 1-33:18-34:10.

-4-

and that he agreed with it because it was necessary to make awards on an equal-ratio basis, which is what she and he "talked about from the very beginning."[24]

HofMann's testimony corroborates Lee's. After the applications had been accepted, HofMann testified that he knew there were "some fairly significant variations between" the estimated and actual numbers.[25] He also testified that he communicated with Lee and Ron Dick, an economist hired by the NPS,[26] and that Dick told him the agency had shifted money between categories to maintain an equal ratio of compensation per dollar of past earnings for all participants.[27] That shift did not surprise HofMann, because he knew it was the only way to compensate on an equal-ratio basis if the estimated and actual numbers differed.[28] He did not seek another concurrence by Rue after hearing about the shift because, according to him, compensating participants on an equal-ratio basis "was in our minds when we were signing those concurrences that we did."[29]

## III. DISCUSSION

The law setting aside $23 million for participants in Glacier Bay National Park commercial fisheries required the NPS to develop a plan for distributing the money and to obtain Alaska's concurrence in that plan. The NPS obtained Alaska's concurrence in the plan it released in September of 2001, but Westcott and Foley argue that the agency changed the plan after it received the state's concurrence and that the change was significant enough to warrant another concurrence by Alaska.

The court agrees with the proposition that a significant change in the plan would have required the NPS to obtain a second concurrence from Alaska, but it disagrees with Westcott and Foley's approach to determining whether the plan changed. They argue the plan changed from an objective viewpoint, but it is Alaska's concurrence that

---

[24] *Id.*, 1-37:17-23.

[25] *Id.*, 1-96:20-24.

[26] *Id.*, 1-96:25-97:2.

[27] *Id.*, 1-98:3-11.

[28] *Id.*, 1-109:22-110:1.

[29] *Id.*, 1-110:2-6.

-5-

matters and, thus, the relevant opinion about whether the plan changed enough to require a second concurrence is Alaska's.

The state's opinion was formed by the people acting on its behalf. Although Rue retained the authority to give Alaska's concurrence, he delegated the authority to decide what required his concurrence to HofMann. Thus, HofMann was authorized to form an opinion on Alaska's behalf about whether the NPS's shifting of money between categories was a change to the plan. He concluded it was not. Consequently, as far as Alaska was concerned, the plan had not changed. Under such circumstances, the NPS was not required to seek another concurrence from Alaska.

## IV. CONCLUSION

For the reasons set out above, the motions at dockets 36 and 41 are **DENIED** on the issue of whether the NPS was required to obtain another concurrence from Alaska. Also, the motion at docket 71 is **DENIED** as moot because the affidavits that are the subject of that motion were not necessary to resolving the issue discussed above.

DATED at Anchorage, Alaska, this 3rd day of March, 2006.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE